**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| ABBVIE INC.; ALLERGAN, INC.; DURATA THERAPEUTICS, INC.; ABBVIE PRODUCTS LLC; PHARMACYCLICS LLC; and ALLERGAN SALES, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-00416-JCN |
| AARON FREY, in his official capacity as Attorney General of the State of Maine; BOB CAREY, in his official capacity as Superintendent of the Bureau of Insurance | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendants Aaron M. Frey, in his official capacity as Attorney General of Maine and Bob Carey, in his official capacity as Superintendent of the Bureau of Insurance, pursuant to Fed. R. Civ. P. 7, hereby Opposes Plaintiffs AbbVie, Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products, LLC, Pharmacyclics LLC, and Allergan Sales, LLC's (collectively "AbbVie") Motion for Preliminary Injunction [ECF Doc. No. 17] ("AbbVie Motion") as follows:

**BACKGROUND**

### A.  AbbVie Plaintiffs' Claims

AbbVie's August 14, 2025 Complaint [ECF Doc. No. 1] seeks declaratory judgment and an order enjoining enforcement of a statute which was signed by the Governor on June 20, 2025

1

as part of L.D. 207, Part P (132nd Legis. 2025) and which will become effective on September 24, 2025.  The statute, designated the "Protect Health Care for Rural and Underserved Communities Act," creates a new Chapter 103 in Maine's Insurance Code, providing in pertinent part:

> **§7753. Prohibition of certain discriminatory actions by manufacturer or agent related to 340B entities**
>
> **1. Interference with acquisition or delivery of 340B drugs prohibited.** A manufacturer or its agent may not deny, restrict, prohibit or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services.
>
> **2. Submission of claims or utilization data prohibited.** A manufacturer or its agent may not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.
>
> **3. Other interference prohibited.** A manufacturer may not otherwise interfere directly or indirectly with a 340B entity unless expressly authorized by the United States Department of Health and Human Services.

24-A M.R.S.A. §7753 (eff. Sept. 24, 2025) ("Chapter 103").  A violation of Chapter 103 is "subject to enforcement under the Maine Unfair Trade Practices Act."  24-A M.R.S.A. §7757 (eff. Sept. 24, 2025).  The Maine Unfair Trade Practices Act authorizes the Attorney General to "bring an action in the name of the State," to enforce violations.  5 M. R.S.A. § 209.

AbbVie alleges that Chapter 103 is preempted by federal law, specifically, 42 U.S.C.A. § 256b. ("Section 340B").  That statute provides, in part, "The Secretary [of the U.S. Department of Health and Human Services] shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid . . . to the manufacturer for covered outpatient drugs . . . purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992, does not exceed an amount equal to the average manufacturer

2

price for the drug under title XIX of the Social Security Act in the preceding calendar quarter, reduced by the rebate percentage described in paragraph (2)." 42 U.S.C.A. § 256b(a)(1). Additionally, "Each such agreement shall require that the manufacturer furnish the Secretary with reports, on a quarterly basis, of the price for each covered outpatient drug subject to the agreement that, according to the manufacturer, represents the maximum price that covered entities may permissibly be required to pay for the drug (referred to in this section as the "ceiling price"), and shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." *Id.* "Covered entity" is defined to include specific types of healthcare facilities. 42 U.S.C.A. § 256b(a)(4).[1]

Section 340B also requires a "covered entity": (i) to avoid claiming both the Section 340B discount and federal drug discounts available elsewhere in the Social Security Act, 42 U.S.C.A. § 256b(a)(5)(A), and (ii) to refrain from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity." 42 U.S.C.A. § 256b(a)(5)(B). To effectuate those two requirements, "[a] covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements

---

[1] Pursuant to 42 U.S.C.A. § 256b(a)(4), the fifteen (15) types of "covered entity" include a "Federally qualified health center", an "entity that serves a population that is medically underserved, or a special medically underserved population comprised of migratory and seasonal agricultural workers, the homeless, and residents of public housing," 42 U.S.C.A. § 254b(a)(1), "hemophilia diagnostic treatment center," and "a critical access hospital" which is, a hospital designated by a State, "that is located in a county (or equivalent unit of local government) in a rural area," which, "makes available 24-hour emergency care services that a State determines are necessary for ensuring access to emergency care services," and, "provides not more than 25 acute care inpatient beds." 42 U.S.C.A. § 1395i-4(c)(2)(B).

described in subparagraphs (A) or (B) with respect to drugs of the manufacturer." 42 U.S.C.A. § 256b(5)(C) (emphasis added). A manufacturer can initiate an administrative dispute resolution process following the statutorily authorized audit. 42 C.F.R. § 10.20 (establishing "a 340B ADR Panel to review and make decisions regarding one or more claims filed by covered entities or manufacturers."); 42 C.F.R. §10.21(a)(2) (defining "claims" to include, "[c]laims by a manufacturer, after it has conducted an audit of a covered entity pursuant to section 340B(a)(5)(C) of the PHS Act, that the covered entity has violated section 340B(a)(5)(A) of the PHS Act, regarding the prohibition of duplicate discounts, or section 340B(a)(5)(B) of the PHS Act, regarding the prohibition of the resale or transfer of covered outpatient drugs to a person who is not a patient of the covered entity.").

AbbVie's Complaint alleges four counts. Count I alleges that Chapter 103 is preempted by Section 340B, based on field or conflict preemption. AbbVie Complaint at 44-51. Count II alleges that Chapter 103 is preempted by the HRSA Pilot Rebate Program based on conflict preemption. *Id.* at 51-52. Count III alleges that Chapter 103 violates the Takings Clause of the United States Constitution. *Id.* at 52-54. Count IV alleges that Chapter 103 violates the Due Process Clause by being unconstitutionally vague. *Id.* at 55-56. AbbVie's Motion now seeks a preliminary injunction to prevent Attorney General Frey and Superintendent Carey from enforcing Chapter 103 pending resolution of their Complaint.

### B. 340B Litigation

If a drug manufacturer wants to access the market comprising the Medicare and Medicaid programs, then it must offer its drugs at discounted prices to congressionally defined healthcare providers which "typically care for low-income and rural persons," pursuant to Section 340B. *Sanofi Aventus U.S. LLC v. U.S. Dept. of Health & Hum. Svcs.*, 58 F 4th 696, 699 (3d Cir. 2023).

Section 340B "uses that market power to get drug makers to subsidize healthcare" provided by that category of healthcare providers: the "covered entities" defined in Section 340B.  *Id.* Section 340B discounts support populations served by covered entities by: (i) giving covered entities "extra revenue from serving insured patients: they turn a profit when insurance companies reimburse them at full price for drugs they bought at the 340B discount," and (ii) enabling covered entities "to give uninsured patients drugs at little or no cost."  *Id.*  (citing Gov't Accountability Off., *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011) (available at https://www.gao.gov/assets/d11836.pdf (last accessed Sept. 9, 2025)).  In Maine, the programs supported by 340B discounts include: medication assistance programs and free health care to uninsured and underinsured patients; behavioral treatment services, including for substance use disorders; food pantries and nutritional assistance; clinical patient navigators in oncology; free transportation services for vulnerable patients; a Controlled Substance Stewardship Program, through which over 1,000 patients have successfully tapered off opioids; HIV and Hepatitis C treatment services; and programs that address homelessness and food insecurity.  Declaration of Brian Marden ("Marden Decl."), ¶ 12 (Exhibit A); Declaration of Meagan Rusby ("Rusby Decl."), ¶10 (Exhibit B).  As the Associate Director of Penobscot Community Health Care ("PCHC"), Maine's largest federally qualified health center,[2] testified, "The savings derived from the 340B Program are essential to PCHC's mission of providing affordable care and services in communities with a large number of uninsured and underinsured patients.").  Rusby Decl. at ¶11.

---

[2] *See* fn.1, *supra.*

Covered entities contract with outside pharmacies to distribute drugs purchased at 340B discounts to their eligible patients. *Sanofi*, 58 F4th at 700. Under those arrangements, "[c]overed entities using contract pharmacies would still order and pay for the drugs, but they would be shipped directly to the pharmacies." *Id.* "The mechanism does not in any way extend this pricing to entities which do not meet program eligibility." *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1142 (8th Cir.) (quoting Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 FR 43549-01). With respect to drugs dispensed by contract pharmacies, some Maine covered entities use the "replenishment model," whereby a contract pharmacy dispenses a covered drug purchased at full retail price to the patient of a covered entity and, following verification that the drug was dispensed to an eligible patient of a covered entity, the covered entity orders a replacement for the dispensed drug at the 340B discounted price. Rusby Decl. at ¶8; Marden Decl. at ¶¶9-10. That practice is common among covered entities in other states as well. *See* footnote 3, *infra.*

After covered entities began using contract pharmacies, drug makers "responded, adopting policies to limit the use of contract pharmacies." *Sanofi*, 58 F4th at 700. The federal Health Resources and Services Administration ("HRSA") is the agency responsible for superintending the 340B program. *McClain*, 95 F.4th at 1141. Shortly after HRSA issued guidance permitting unlimited use of contract pharmacies by covered entities, drug manufacturers successfully challenged HRSA's statutory basis to address delivery of 340B drugs. *See, e.g., Sanofi*, 58 F.4th at 707, *Novartis v. Johnson*, 102 F 4th 452, 464 (D.C.Cir. 2024). Those challenges succeeded on the basis that Section 340B, while mandating price discounts to covered entities, was "silent" about the delivery of those discounted drugs. *Id.*; *Sanofi*, 58 F.4th at 702-703 (reviewing HRSA action pursuant to Administrative Procedures Act standard, 5 U.S.C.A. § 706(2)(A), requiring

6

statutory foundation for agency action). Concurrently with drug manufacturers' imposition of restrictions on covered entities' ability to use contract pharmacies by imposing their own "policies," *id.* at 700, various states enacted statutes regarding the use of contract pharmacies. *See, e.g., McClain*, 95 F.4th at 1139 (addressing Arkansas statute "prohibit[ing] manufacturers from limiting covered entities' ability to contract with outside pharmacies."). There are now various actions pending in federal courts nationwide challenging the statutes enacted by over a dozen states to prohibit manufacturers from limiting the ability of covered entities operating within those states from contracting with outside pharmacies.[3]

## JURISDICTION AND VENUE

AbbVie alleges that this Court has subject matter jurisdiction because its complaint asserts claims arising under federal law. 28 U.S.C.A. § 1331; 42 U.S.C.A. § 1983. AbbVie's Complaint at 10. AbbVie alleges that its request for declaratory and injunctive relief pursuant to 28 U.S.C.A. §§ 2201-2202 arises from a justiciable controversy sufficient to satisfy the Article III "case or controversy" requirement. *Id.* Venue is proper in this court based on AbbVie's allegations that it "sells and distributes drugs to multiple 340B covered entities within this district . . . ." *Id.* at 11 (citing 28 U.S.C.A. § 1391(b)).

---

[3] *McClain*, 95 F.4th 1136 (Ark.); *AbbVie, Inc. et al. v. Weiser, et al.*, 1:25-cv-01847 (D.Co.); *AbbVie, et al. v. Lopez*, 1:25-cv-00230 (D.Haw.); *AbbVie, Inc., et al. v. Kobach*, 6:24-cv-01111 (D.Kan. Dec. 12, 2024); *Pharm. Rsch. & Mfgs. of Am. v. Murrill*, 2024 WL 4361597 (W.D.La. Sept. 30, 2024); *Novartis Pharm. Corp. v. Brown*, 1:24-cv-01557 (D.Md.); *AbbVie, Inc. v. Ellison*, 2025 WL 1003909 (D.Minn. Apr. 3, 2025); *Novartis Pharmaceuticals v. Fitch*, 738 F.Supp.3d 737 (S.D. Miss 2024) (denying motion for preliminary injunction); *AbbVie, Inc., et al. v. Bailey, et al.*, 4:24-cv-00996 (E.D. Mo. Jul. 11, 2025); *Astrazeneca Pharms. LP v. Bailey*, 2025 WL 644285 (W.D.Mo. Feb. 27, 2025); *AbbVie, Inc. v. Wrigley, et al.*, 1:25-cv-00081 (D. N.D.); *AbbVie, Inc. v. Hilgers*, 4:25-cv-03089 (D. Neb.); *AbbVie, Inc., et al. v. Jackley, et al.*, 3:25-cv-03006 (D. S.D.); *AbbVie v. Skrmetti*, 2025 WL 1805271 (M.D. Tenn. Jun. 30, 2025) (denying motion for preliminary injunction); *Novartis Pharmaceuticals v. Brown, et al.*, 2:25-cv-00284 (D. Utah); *Pharm. Rsch. & Manufacturers of Am. v. Morrisey*, 760 F.Supp.3d 439 (S.D. W.Va. 2024).

## STANDARD OF REVIEW

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right. *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Accordingly, "trial courts have wide discretion in making judgments regarding the appropriateness of "preliminary injunctive relief." *Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009). In exercising that discretion, "it is well established" that a trial court "is to bear constantly in mind that an injunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case." *Doe on behalf of Doe v. Portland Pub. Sch.*, 701 F. Supp. 3d 18, 32 (D. Me. 2023) (quoting *Sanchez*, 572 F.3d at 14 and *Saco Defense Sys. Div. Maremont Corp. v. Weinberger*, 606 F. Supp. 446, 450 (D. Me. 1985)) (internal citation omitted). The purpose of a preliminary injunction, "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

A plaintiff seeking a preliminary injunction "must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *New Jersey v. Trump*, 131 F.4th 27, 33–34 (1st Cir. 2025) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). The plaintiff "bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter." *Murthy*, 603 U.S. at 58 (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). A plaintiff at the preliminary injunction stage must present support for standing in the same "manner and degree of evidence required at the successive stages of the litigation." *Murthy*, 603 U.S. at 58 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The elements of standing are an

"injury in fact," that is "fairly traceable to the challenged conduct of the defendant," which injury "is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560-561; *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–181 (2000).

If a plaintiff establishes standing, then, to justify issuance of a preliminary injunction, a plaintiff "must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in [its] favor and (4) an injunction is in the public interest." *New Jersey*, 131 F.4th at 33-34 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)) (internal quotations and citation omitted). The party seeking a preliminary injunction must make a "clear showing" regarding each element to justify the issuance of a preliminary injunction. *Starbucks Corp.*, 602 U.S. at 346 (citing *Winter*, 555 U.S. at 20, 22 (2008)). "[L]ikelihood of success on the merits[] is considered the most important of the four elements and the "sine qua non" of the calculus." *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 76 (D. Mass. 2025) (citing *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)).

## ARGUMENT AND MEMORANDUM OF LAW

As a preliminary jurisdictional matter, AbbVie's Complaint fails to allege injury resulting from the Maine statute they seek to invalidate – Chapter 103. Instead, AbbVie alleges that its injury, allegedly being forced to sell drugs at discount prices, arises from covered entities claiming 340B discounts for transactions barred by Section 340B. Chapter 103 does not require AbbVie to sell any more drugs than it otherwise would. As framed by AbbVie, the *replenishment model* requires AbbVie to sell more drugs than it otherwise would – in violation of Section 340B. The only potentially federally protected interest which AbbVie claims in its

Complaint is the alleged violation of Section 340B by persons other than Defendant.  Attorney General Frey or Superintendent Carey's enforcement of Chapter 103 is irrelevant to the transaction that AbbVie alleges has or will cause it injury.  AbbVie cannot meet its burden to establish its Article III standing necessary, at this stage, to pursue its request for preliminary injunctive relief.  To the extent the Court reaches the preliminary injunction factors, AbbVie cannot meet any of the four elements necessary to justify enjoining enforcement of Chapter 103.

Substantively, AbbVie's Motion asserts two arguments in support of federal preemption.  First, that a Maine statute prohibiting drug manufacturers from interfering with the delivery of prescription drugs to a pharmacy is preempted by a federal statute which "is silent as to permissible drug distribution systems." *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 645 F. Supp. 3d 890, 899 (E.D. Ark. 2022), *aff'd,* 95 F.4th 1136 (8th Cir. 2024) (quoting Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 FR 43549-01).  Second, AbbVie contends that the Maine statute preserving Maine health care entities' freedom to contract with pharmacies creates an intractable conflict with a federal law that, "does not include even a single reference to the pertinent word (e.g. 'pharmacy')." *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 59 (D. Del. 2021) ("The statute is silent as to the role that contract pharmacies may play in connection with covered entities' purchases of 340B drugs."); *see also McClain*, 95 F.4th at 1142 ("the 340B Program 'is silent about delivery' and distribution of pharmaceuticals to patients." (quoting *Sanofi*, 58 F 4th at 703)).  However, "[e]vidence of pre-emptive purpose," whether express or implied, must [] be "sought in the text and structure of the statute at issue." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U. S. 658, 664 (1993)).  AbbVie cannot both preserve congressional silence in Section 340B on the ability of a "covered entity" to freely

contract with pharmacies, *Sanofi*, 58 F 4th at 707, and viably claim that 340B preempts Chapter 103's prohibition against drug manufacturers interfering with contracts between Maine health care providers and pharmacies by unilaterally restricting where prescription drugs are delivered. *See Novartis*, 102 F.4th at 461 (concluding that "section 340B 'is silent about delivery.'").

In a decision invalidating HRSA guidance that Section 340B requires drug manufacturers to deliver Section 340B discounted drugs to as many contract pharmacies as designated by a covered entity, the Third Circuit Court of Appeals analyzed whether that mandate was established in the Section 340B – the statute which HRSA asserted provided the authorization for the challenged regulation. *Sanofi*, 58 F.4th at 703 (citing 5 U.S.C.A. § 706(2)(A)). Concluding that Section 340B said nothing whatsoever about the manner in which 340B drugs are to be delivered, the Third Circuit held, "Legal duties do not spring from silence. Congress never said that drug makers must deliver discounted Section 340B drugs to an unlimited number of contract pharmacies. So by trying to enforce that supposed requirement, the government overstepped the statute's bounds." *Id.* at 707. The relevance of *Sanofi* to AbbVie's Complaint is not the outcome – preventing a result similar to that which AbbVie contends Chapter 103 imposes – but that HRSA, unlike Maine, derived the authority to issue the rejected guidance from the text of Section 340B: text which the *Sanofi* court held included nothing addressing the delivery of drugs to contract pharmacies. *Id.* at 703; *see also Novartis*, 102 F.4th at 459-460 (concluding that HRSA guidance "lack[ed] the force of law" pursuant to the Administrative Procedures Act ("APA") because Section 340B is "silent about delivery conditions."). Congressional silence on delivery to contract pharmacies does not support preempting a state-imposed requirement to deliver to contract pharmacies.

11

Regarding its third contention on the merits of its claims, AbbVie's argument asserting a violation of the Takings Clause fails because Chapter 103 does not effect a "taking".  Finally, AbbVie's claim that Chapter 103 is unconstitutionally vague likewise fails to meet its burden of establishing that Chapter 103 is, "incapable of any valid application."  *Steffel v. Thompson*, 415 U.S. 452, 474 (1974).

AbbVie's contentions regarding the second, third, and fourth factors it is required to meet to justify this Court's imposition of the "extraordinary and drastic remedy" which it demands, *Peoples Fed. Sav. Bank*, 672 F.3d at 8-9, rely on a finding in AbbVie's favor on the first factor: likelihood of success on the merits of AbbVie's claim that Chapter 103 is unconstitutional. Because AbbVie has failed to demonstrate that it is likely to prevail on the merits of its claims, its efforts to meet the irreparable harm, balance of equities, and public interest factors likewise fall short.

### A.  AbbVie fails to meet its burden to establish the elements of standing required to establish this Court's jurisdiction.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Raines v. Byrd,* 521 U.S. 811, 818 (1997).  "At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58; *see also New Jersey*, 131 F.4th at 33-34.  The elements of standing require that a plaintiff sufficiently allege that it, "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338.

The injury which AbbVie contends justifies treating their claim as a "case or controversy" arises from its allegation that covered entities are violating and/or will violate Section 340B prohibitions against "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity." 42 U.S.C.A. § 256b(a)(5)(B); AbbVie Complaint at 149 ("[T]he replenishment model results in diversion, which the federal statute forbids."); *id.* at 47 ("Chapter 103 . . . attempts to force manufacturers to transfer their drugs to third parties . . . who are not covered entities.")However, payment of Section 340B discounts in circumstances prohibited by Section 340B is not an injury caused by Chapter 103 – the statute which AbbVie seeks to invalidate.  Chapter 103 prohibits a drug manufacturer from interfering with the acquisition or delivery of a 340B drug by a covered entity, "unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services."  24-A M.R.S.A. § 7753(1). "[R]esell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity," is prohibited by DHHS.  42 U.S.C.A. § 256b(a)(5)(B).

The injury which AbbVie alleges converts its disagreement with the policy embodied by Chapter 103 into a "case or controversy" cognizable by this Court is that Chapter 103 will require it to deliver more discounted drugs than it would be required to provide without Chapter 103. AbbVie appears to allege that Chapter 103 will injure it by requiring more transactions – and therefore more discounted sales – than Section 340B.  AbbVie Complaint at 39 ("AbbVie's injuries are fairly traceable to Chapter 103 because the state statute compels a private transfer of AbbVie's 340B discounted drugs to private, for profit commercial pharmacies"); *id.* at 41 (identifying [t]he cost to AbbVie of complying with" the alleged requirement to conduct more discounted transactions).  While financial loss can qualify as an injury sufficient to meet the "case or controversy" requirement, the missing element from AbbVie's summary of its injury – and the

13

reason why much of AbbVie's Complaint and Motion detail and then advocate the evils of the "replenishment model" – is that AbbVie's claimed injury arises not from an increase in sales authorized by Section 340B but from alleged violation of Section 340B's prohibition on "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity."  42 U.S.C.A. § 256b(a)(5)(B); AbbVie Complaint at 23 ("When commercial pharmacies are brought into the [340B ]program, there is a significantly greater risk that manufacturers' discounted drugs will be dispensed to individuals who are not 'patients' of the covered entity.").

AbbVie must identify an injury "fairly traceable" to enforcement of Chapter 103 by Attorney General Frey or Superintendent Carey and support a conclusion that AbbVie's requested invalidation of Chapter 103 will redress that injury.  The injury that AbbVie alleges – AbbVie's loss of expected revenue from the diversion of discounted drugs from "covered entities" to "a person who is not a patient of the entity," – is prohibited by Section 340B.  42 U.S.C.A. § 256b(a)(5)(B).  Chapter 103 expressly excepts federally prohibited transfers.  24-A M.R.S.A. § 7753(1).  AbbVie's claimed injury is not "fairly traceable" to Chapter 103.  *Cf. Spokeo*, 578 U.S. at 338 (standing requires allegation of injury "fairly traceable to the challenged conduct of the defendant," which is "likely to be redressed by a favorable judicial decision.").  Therefore, AbbVie's Motion demanding a preliminary injunction fails to support AbbVie's burden to "make a 'clear showing' that [it] is 'likely' to establish each element of standing." *New Jersey*, 131 F.4th at 33-34.  This Court should, accordingly, deny AbbVie's Motion.

### B.  AbbVie fails to establish that it will likely prevail on the merits of its claims.

AbbVie challenges Chapter 103 on its face: contending that this court must render a decision before the September 24, 2025 effective date. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish

that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). AbbVie's reliance on predicted violations of covered entities' obligation to refrain from transfers expressly prohibited by Section 340B fails to meet this requirement. *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 77–78 (1st Cir. 2001) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982))). Likewise, this Court "must avoid declaring [a state law] unconstitutional where a constitutionally permissible construction is available." *Ouellette v. Mills*, 91 F.Supp.3d 1, 6 (D. Me. 2015) (citing *Vaqueria Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 26 (1st Cir. 2014). AbbVie fails to meet its primary burden: establishing a likelihood of success on the merits of their claims alleging field preemption, conflict preemption, and violation of the dormant commerce clause.

### 1. Chapter 103 is not preempted by field preemption.

Count I of AbbVie's Complaint alleges that Chapter 103 is preempted because, "Chapter 103 directly intrudes on the federal 340B scheme." AbbVie's Complaint at 45. "A state law is preempted under field preemption when Congress has 'occupied the field' by creating "a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' " or "where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Algonquin Gas Transmission, LLC v. Town of Weymouth*, 365 F. Supp. 3d 147, 156 (D. Mass. 2019). (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). "[F]ield preemption is generally disfavored absent clear [congressional] intent." *Franklin California Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 342 (1st Cir. 2015). Where, "the question is whether there is a probability that Maine's program was pre-empted by the mere existence of the federal statute," a court evaluating a field preemption claim

15

must start, "with a presumption that the state statute is valid, and ask whether petitioner has shouldered the burden of overcoming that presumption." *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 661–62 (2003) (citing *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 15 (1944) (internal citation omitted).

AbbVie attempts to premise its argument on field preemption with a narrowly self-serving "field" of "the terms of a 340B offer." AbbVie's Motion at 11. There is, unsurprisingly, no support in AbbVie's cited authority for defining a field for the purpose of preemption analysis solely by reference to the allegedly preempting federal law. The field at issue is more accurately described as the practice of pharmacy or delivery of prescription drugs. *See, e.g., McClain*, 95 F.4th at 1143 (defining field in preemption challenge to analogous Arkansas statute as, "the practice of pharmacy"); *Bailey*, 2025 WL 644281 at *5 (same). This Court's decision in *Ouellette* supports framing the "field" based on the transaction, not the federal statute. 91 F.Supp.3d at 9. Finding that, although the challenged Maine law permitting patients to obtain mail order drugs from five specified foreign countries had to do with the practice of pharmacy, the statute's authorization of five foreign countries to "export" pharmaceuticals rendered the relevant field, "the importation of foreign pharmaceuticals." *Id.*

"Courts should not infer field preemption in 'areas that have been traditionally occupied by the states,' in which case congressional intent to preempt must be 'clear and manifest.'" *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). "Where the field which Congress is said to have pre-empted includes areas that have been traditionally occupied by the States, congressional intent to supersede state laws must be 'clear and manifest.'" *English*, 496 U.S. at 79 (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525 (1977)). Health and safety are areas traditionally occupied

16

by the states.  *See, e.g., Ouellette*, 91 F. Supp.3d at 9 (observing that regulation of pharmacies and pharmacists are within "the traditionally local sphere of public health and safety."); 32 M.R.S.A. § 13731(1) (requiring those who 'engage in the practice of pharmacy' to be licensed).

"[W]hether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme."  *Ouellette*, 91 F. Supp. 3d at 9 (quoting *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 714 (1985)).  Specific to the 340B Program, "since the 1990s, covered entities have contracted with outside pharmacies to handle the acquisition, distribution, and dispensation of 340B drugs." *McClain*, 95 F.4th at 1142.  Consistent with the conclusion in *Sanofi*, HRSA concluded almost 30 years ago, "The [340B] statute is silent as to permissible drug distribution systems. There is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself. It is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities."  Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 FR 43549-01.  While Congress recognized that entities other than drug manufacturers and covered entities were involved in distribution, it chose not to address contract pharmacies, in contrast to third-party drug wholesalers.  42 U.S.C.A. § 256b(a)(8) (directing DHHS to "establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs," where covered entities did not purchase 340B drugs directly from a manufacturer).  "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension

17

there [is] between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166–167 (1989).

"The presumption against federal pre-emption of a state statute designed to foster public health has special force when it appears . . . that the two governments are pursuing 'common purposes.'" *Walsh*, 538 U.S. at 666 (citing *Hillsborough Cnty.*, 471 U.S. at 715-718 and *New York State Dept. of Social Servs. v. Dublino,* 413 U.S. 405, 421 (1973)) (internal citation omitted); *see also Concannon*, 249 F.3d at 75 ("Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one."). Here, Chapter 103 preserves the benefit and purpose of Section 340B to Maine covered entities – providing covered entities with "extra revenue" to serve poor and traditionally underserved patients. *Sanofi*, 58 F 4th at 699; *see also* Marden Decl. at ¶¶ 12-14; Rusby Decl. at ¶¶10-12.

Chapter 103 addresses a specific issue: whether covered entities can contract with pharmacies to distribute 340B drugs to their patients. 24-A M.R.S.A. §§ 7753; 7757. AbbVie's argument for field preemption relies on the counterfactual premise that Congress was unaware of the role of pharmacies in effectuating the purpose of Section 340B and traditional state regulation of pharmacies. Contrary to AbbVie's contentions, Congress has taken no action in Section 340B to exclusively occupy a field including restricting the rights of Maine healthcare providers to enter into contracts with pharmacies. Moreover, Congress has not, through its enactment of Section 340B, expressed an intent to intrude into the traditional state realm of regulating health and safety with respect to the regulation of pharmacies necessary to support AbbVie's field preemption argument. *See, e.g., Pharm. Rsch. & Manufacturers of Am. v. Fitch*, 2024 WL 3277365 at *11 (S.D. Miss. July 1, 2024) ("[M]erely because [Section 340B is] sufficiently comprehensive to

18

meet the need identified by Congress [does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." (quoting *Hillsborough Cnty.*, 471 U.S. at 717)) (alterations in original).

The statute AbbVie claims occupies the field of delivery of pharmaceuticals subject to the 340B program says nothing about delivery. AbbVie has not demonstrated a likelihood that it will prevail on the merits of its field preemption claim. AbbVie's Motion should be denied. *See, e.g., Skrmetti*, 2025 WL 1805271 at *13 (finding no field preemption in challenge to analogous state statute)*; Bailey*, 2025 WL 644281 at *5 (same); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657, 665 (S.D. Miss. 2024) (same); *Murrill*, 2024 WL 4361597 at *8 (same).

### 2. Chapter 103 is not preempted under conflict-preemption.

Count I of AbbVie's Complaint also alleges conflict preemption. AbbVie's Complaint at 47. The premise of AbbVie's conflict preemption argument appears to be that Chapter 103 impermissibly addresses contract pharmacies. Section 340B does not address contract pharmacies at all. That is not a conflict. The federal statutory silence has now been determinative in successful APA challenges to federal agency guidance, challenges which were justified by 340B's silence. AbbVie's attempt to convert *Sanofi* and *Novartis's* reliance on 340B silence on delivery into affirmative endorsements of drug manufacturer's refusal to deliver 340B drugs is an aspirational attempt to fill the silence. *Sanofi*, 58 F.4th at 707, *Novartis*, 102 F 4th at 464. While 340B's silence rendered DHHS's guidance *ultra vires* under the APA standard requiring a statutory foundation for agency action, 5 U.S.C.A. § 706(2)(A), that same silence undermines AbbVie's claim of conflict preemption here.

Conflict preemption may be either express, "when congressional intent to preempt state law is made explicit in the language of a federal statute," *Consumer Data Indus. Ass'n v. Frey*, 26

F.4th 1, 5 (1st Cir. 2022), or implied, "when state law imposes a duty that is "inconsistent – i.e., in conflict – with federal law." *Id.* (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 478 (2018)). Here, AbbVie contends that Section 340B impliedly, as opposed to expressly, preempts Chapter 103 because of a conflict between the two statutes. AbbVie's Complaint at 47. "A state law is preempted under conflict preemption when it either makes "compliance with both federal and state regulations [ ] a physical impossibility," or "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Algonquin*, 365 F. Supp. 3d at 156. (quoting *Arizona*, 567 U.S. at 399 and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (internal citations omitted). A plaintiff's burden to establish that state law is an "obstacle" justifying preemption is not satisfied by establishing that a state law will have *some* effect on an area addressed by federal law. *Walsh*, 538 U.S. at 667 ("[T]he mere fact that [Maine's] prior authorization [process] may impose a modest impediment to access to prescription drugs provided at government expense [i.e. Medicaid] does not provide a sufficient basis for pre-emption of the entire Maine Rx Program.") *Id.*

Longstanding federal precedent establishes that "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. National Solid Wastes Management Assn.,* 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and concurring in judgment)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). However, in conducting the analysis of whether a plaintiff has established implied conflict preemption, courts are cautioned that, "[i]mplied preemption

analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" based on the principle that, "such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Whiting*, 563 U.S. at 607 (quoting *Gade*, 505 U.S. at 111) (Kennedy, J., concurring in part and concurring in judgment).

Health and safety regulations, such as the regulation of delivery of prescription drugs, are traditionally an area of state regulation. *Ouellette*, 91 F.Supp.3d at 6. In addition to the "high threshold" for implied preemption, there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough Cnty*, 471 U.S. at 715. "When addressing questions of express or implied preemption, we begin our analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). "Because 'federal law is said to bar state action in [a] fiel[d] of traditional state regulation,' namely, advertising, we 'wor[k] on the assumption that the historic police powers of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress'" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 542 (2001) (internal citation omitted); *see also Arizona*, 567 U.S. at 400 ("In preemption analysis, courts should assume that "the historic police powers of the States" are not superseded "unless that was the clear and manifest purpose of Congress." (quoting *Santa Fe Elevator Corp.*, 331 U.S. at 230).

AbbVie's arguments urging conflict preemption, as with their attempts at asserting field preemption, *supra.*, neither address nor overcome the presumption against implied preemption of

21

state health and safety laws.  AbbVie's first argument rests on its citation-free premise that 340B's silence regarding delivery as "confer[s] a right" on it to impose restrictions on the delivery of drugs sold at 340B discounts.  Abbive's Motion at 13.  Contrary to AbbVie's premise that it seeks to protect the "public interest" favoring "our federal structure," AbbVie's Motion at 2, AbbVie's premise that federal legislative silence on a subject confers an affirmative right against state legislation on that subject ignores the "dual sovereignty" inherent in federalism which provides the foundation for the preemption analysis.  *See Murphy*, 584 U.S. at 470 ("[B]oth the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of 'dual sovereignty.'" (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 457 (1991))).  The First Circuit decision on which AbbVie's argument relies, *Maine Forest Prods. Council*, directly undermines AbbVie's premise that federal silence confers a "right" protected from infringement by state action.  51 F.4th 1, 10 (1st Cir. 2022).  The state statute at issue in *Cormier*, "prohibit[ed] motor carriers and landowners owning at least 50,000 acres of Maine forest land from hiring anyone who is not a 'resident of the United States' to drive a vehicle 'transport[ing] forest products' from one place to another within Maine.  *Id.* at 3. The court construed the federal law at issue, the H-2A visa program, as "a means of addressing the unmet seasonal labor needs of agricultural employers by conferring a right to hire foreign laborers under specified conditions."  *Id.* at 10.  Prior to reaching its conclusion, however, the court in *Cormier* noted that the identification of a "right" arose from guidance from the Supreme Court to avoid, "judicial [e]fforts to ascribe unenacted purposes and objectives to a federal statute."  *Maine Forest Prods.*, 51 F.4th at 8 (quoting *Virginia Uranium*, 587 U.S. at 778) (internal quotations omitted).  The "right" AbbVie urges appears nowhere in Section 340B. *Novartis*, 102 F.4th at 459-460 (Section 340B is "silent about delivery conditions.").

AbbVie identifies areas in which Section 340B empowers HRSA enforcement in support of its second contention that Chapter 103 creates "parallel enforcement" schemes. AbbVie Motion at 14-15. HRSA administratively enforces three types of "claims": covered entities claims of wrongfully withheld 340B discounts, 42 C.F.R. §10.21(a)(1), and manufacturer claims, "that the covered entity has violated section 340B(a)(5)(A) of the PHS Act, regarding the prohibition of duplicate discounts, or section 340B(a)(5)(B) of the PHS Act, regarding the prohibition of the resale or transfer of covered outpatient drugs to a person who is not a patient of the covered entity." 42 C.F.R. §10.21(a)(2). In contrast, Chapter 103 designates interference with the delivery of a 340B drug, conditioning delivery of a 340B drug on provision of "claims or utilization data," and interference with a 340B entity as the basis for enforcement action by the Attorney General pursuant to a claim under the Maine Unfair Trade Practices Act. 24-A M.R.S.A. §§ 7753(1)-(3); 7757. Claims subject to enforcement under Chapter 103 are distinct from those reserved to HRSA. AbbVie's speculation about potentially conflicting decisions between HRSA pricing rulings and future Maine adjudications under Chapter 103 ignores the complimentary silences between Chapter 103 and Section 340B: Chapter 103 does not address pricing just as Section 340B does not address delivery. *See Sanofi*, 58 F4th at 707. Instead, AbbVie's hypothetical illustrates its underlying contention that covered entities are violating, and will continue to violate, federal law prohibiting "unlawful diversion," *see* Section A, *supra*. That hypothetical also fails to meet AbbVie's burden to demonstrate "that *no set of circumstances exists* under which the Act would be valid." *Salerno*, 481 U.S. at 745 (emphasis added); *see also Norman Williams Co.*, 458 U.S. at 659 ("a hypothetical or potential conflict is insufficient").

AbbVie argues that Chapter 103 prevents its access to data that Section 340B requires covered entities to provide, AbbVie's Motion at 15-16, and that federal regulations contemplate

that such data will be provided. *Id.* at 17.[4]  Section 340B authorizes manufacturers to conduct

audits of a covered entity's records "that directly pertain to the entity's compliance with" Section

340B's prohibition of drug diversion and discount duplication.  42 U.S.C.A. § 256b(a)(5)(A)(C).

Accordingly, AbbVie's argument relies on unsupported premise that covered entities will only

comply with their federal statutory obligation to provide claims data if AbbVie conditions

delivery of 340B drugs on provision of that data.  AbbVie Motion at 15-16.  Chapter 103 does

not make it impossible for AbbVie to gather information that Section 340B expressly authorizes.

42 U.S.C.A. § 256b(a)(5)(C) ("A covered entity shall permit . .  the manufacturer of a covered

outpatient drug that is subject to an agreement under this subsection with the entity . . . to audit at

. . . the manufacturer's expense the records of the entity that directly pertain to the entity's

compliance with the requirements described in subparagraphs (A) or (B) with respect to drugs of

the manufacturer.").  Chapter 103 prohibits a manufacturer from demanding claims data "as a

condition for" delivery of a 340B drug.  24-A M.R.S.A. § 7753(2).  Chapter 103 has no effect on

either Section 340B's audit provision, which does not specify the timing of audits, or on the

assertion of a claim by a drug manufacturer to support a claim that a covered entity has violated

340B's prohibition against transferring a 340B drug to a person who is not a patient of a covered

entity or impermissibly duplicated federal drug discounts.  42 U.S.C.A. § 256b(a)(5)(A)-(B).

AbbVie, at best, identifies a scenario in which it can collect the information authorized by

Section 340B in any way imaginable except as a condition precedent to providing the pricing

discount mandated by Section 340B.  Moreover, if AbbVie convinces HRSA to decide that

---

[4] Centers for Medicare & Medicaid Services, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027* at 54 (available at https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf) (last accessed Sept. 11, 2025) ("CMS expects manufacturers to work with dispensing entities, covered entities and their 340B Third Party Administrators (TPAs), and other prescription drug supply chain stakeholders to facilitate access to the lower of the MFP and the 340B ceiling price consistent with their statutory obligations.").

AbbVie should be permitted to exercise its audit rights, 42 U.S.C.A. §256b(5)(C), by unilaterally imposing mandatory conditions on covered entities before complying with its own express statutory obligations to offer discounted pricing to those covered entities, then Chapter 103 will not interfere with that decision.  24-A M.R.S.A. § 7753(2) (restriction on demanding data "as a condition for" delivery of discounted drug inapplicable where, "data sharing is required by the United States Department of Health and Human Services.").[5]  As with prior arguments, AbbVie's hypothetical does not meet its burden.  *Norman Williams Co.*, 458 U.S. at 659.

AbbVie has failed to support its conflict preemption argument.  There is no conflict between Chapter 103 and Section 340B.  AbbVie's Motion should, accordingly, be denied.

### 3.   Chapter 103 does not violate the Takings Clause.

AbbVie also argues that Chapter 103 is an unconstitutional taking.  "The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment," prohibits a state from taking private property for public use without just compensation. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021).  "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Where the challenged government action is not "a direct appropriation or ouster," courts consider whether it is so onerous that it constitutes a regulatory taking.  *Id.*  Because "government regulation—by definition—involves the adjustments of rights for the public good," just two narrow "categories of regulatory action . .

---

[5] Notwithstanding AbbVie's preference for the outcome in *PhRMA v. Morrisey*, the single case in which a pharmaceutical manufacturer was able to successfully press its request for a preliminary injunction, recent review of available decisions indicate that all other courts which have considered analogous 340B preemption challenges have uniformly ruled against the substantive arguments which AbbVie presses in support of its request. *See, e.g., Skrmetti*, 2025 WL 1805271 at *13 (finding no field preemption in challenge to analogous state statute)*; Bailey*, 2025 WL 644281 at *5 (same); *Fitch*, 766 F. Supp. 3d at 665 (same); *Murrill*, 2024 WL 4361597 at *8 (same).

. generally will be deemed *per se* takings": (1) laws that require "an owner to suffer a permanent physical invasion of property" and (2) laws that "completely deprive an owner of all economically beneficial use" of the property. *Id.* at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp*, 458 U.S. 419 (1982) and *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)). Outside these two categories, takings challenges to state laws are governed by *Penn Central Transp. Co. v. New York* City, under which a diminution in value of property, standing alone, cannot establish a taking, 438 U.S. 104, 131 (1978).

AbbVie's Motion contends that Chapter 103 is a "physical taking" of its drugs, serving "no recognized public use." AbbVie's Motion at 18. However, Chapter 103 does not compel AbbVie to transfer its property through sales. *Cf.* AbbVie's Motion at 17 (arguing that Chapter 103 "forc[es] AbbVie to transfer its pharmaceutical products to private third parties for discounted prices"). Section 340B compels drug manufacturers to provide discounted prices on drug sales to covered entities as a condition of those manufacturers' participation in Medicare. *Sanofi*, 58 F4th at 699. Chapter 103 prohibits AbbVie from interfering with sales compelled by Section 340B. Therefore Chapter 103 is not a "taking."

While unnecessary to the Court's review of AbbVie's takings claim absent proof of a "taking," AbbVie's unsupported assertion that Chapter 103 serves "no recognized public use" is incorrect. "[R]eflecting [a] longstanding policy of deference to legislative judgments in this field," the United States Supreme Court has, "embraced the broader and more natural interpretation of public use as 'public purpose.'" *Kelo v. City of New London*, 545 U.S. 469, 480 (2005); *id.* at 483-484 (concluding that economic redevelopment of a neighborhood qualified as . "public purpose"). Chapter 103 prohibits interference with congressional direction that drug manufacturers contribute to financial support for covered entities' provision of critical health

care services in underserved Maine communities. *Sanofi*, 58 F 4th at 699. AbbVie's conception "harm" from Chapter 103 – more Section 340B sales - directly supports a finding that Chapter 103 serves a public purpose.[6] AbbVie's policy arguments regarding the effectiveness of Section 340B in achieving its purpose are irrelevant to the governing standard. Because Chapter 103 does not effectuate a "taking," AbbVie's challenge fails.

### 4. Chapter 103 is not unconstitutionally vague.

AbbVie argues that Chapter 103 is so vague that it violates AbbVie's due process rights under the Fourteenth Amendment. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Violations of Chapter 103 risk incurring civil rather than criminal penalties. AbbVie's "void for vagueness" challenge therefore faces an uphill battle. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95, 498-499 (1982) (there is "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). Moreover, consistent with the *Salerno* standard, holding that, if a statute "implicates no constitutionally protected conduct, [a court] should uphold the challenge

---

[6] Because AbbVie conflates its affirmative obligations under Section 340B with the forbearance required by Chapter 103, the fact that Section 340B is, itself, not an unconstitutional "taking" obviates any need to parse through AbbVie's muddling of federal and state obligations. "When private parties 'voluntarily accept responsibilities under' federal law because 'they consider it in their best interest to do so,' no taking occurs." *AbbVie Inc. v. Fitch*, 2024 WL 3503965 at *17 (S.D. Miss. July 22, 2024) (quoting *Burditt v. U.S. Dep't of Health & Hum. Servs*, 934 F.2d 1362, 1376 (5th Cir. 1991); see also *Eli Lilly & Co. v. United States Dep't of Health & Hum. Servs.*, 2021 WL 5039566, at *21 (S.D. Ind. Oct. 29, 2021) (holding that drug manufacturers had "voluntarily chosen to participate in the 340B program and were thus free to terminate their participation if and when they may choose to do so" and that "[s]uch voluntariness forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation."). A party's control of circumstances determining whether its property is subject to a "taking" undermines the essential element of a viable takings claim. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984).

only if the enactment is impermissibly vague in all of its applications." *Id.* at 498-499. AbbVie's Motion does not identify any constitutionally protected conduct allegedly implicated by Chapter 103.

AbbVie's Motion impugns the term "interfere" while ignoring the other active verbs in in Chapter 103: "deny, restrict, [and] prohibit." Similarly, the AbbVie Motion does not assert or support the necessary basis for invalidating Chapter 103 based on vagueness, that it is "incapable of any valid application,. *See Steffel*, 415 U.S. at 474. AbbVie's facial challenge to Chapter 103 must, therefore, fail. *See Vill. of Hoffman Ests.*, 455 U.S. at 494-495.

If the Court is inclined to address the meaning of "interfere," AbbVie's vagueness argument quickly falls away.[7] Chapter 103 does not define the term "interfere." Not every term of legislative enactments requires a definition. *See Rose v. Locke*, 423 U.S. 48, 49-50 (1975) The word "interfere" appears in dozens of Maine statutes without an express definition and without paralyzing compliance. *See*, *e.g.*, 5 M.R.S.A. § 4633(2) (making it unlawful for a person to coerce, intimidate, threaten, or interfere with an individual's exercise or enjoyment of rights granted or protected by the Maine Human Rights Act); 26 M.R.S.A. § 963 (prohibiting interference with a public employee's right to join or not join a union). Moreover, the concept of interference with contracts has been part of Maine common law for over a century. *See Harlor v. Amica Mut. Ins. Co.*, 2016 ME 161, ¶ 30, 150 A.3d 793 (*J. Alexander,* concurring) (noting that the Law Court's first opinion recognizing an action for tortious interference with a contract was *Perkins v. Pendleton*, 90 Me. 166, 38 A. 96 (1897)).

---

[7] AbbVie's Motion relies, in part, on *Carolina Youth Action Project v. Wilson*, 60 F.4th 770 (4th Cir. 2023). That matter is distinguishable from the analysis of Chapter 103 because the statutes at issue in that case were criminal, implicated First Amendment rights, and the prohibited conduct was untethered from any particular act or activity. *See Carolina Youth Action Project*, 60 F.4th at 786 (noting that challenged statute broadly prohibited "interfere[ing] with . . . students or teachers of any school or college in this State").

Standard canons of statutory construction also undermine AbbVie's effort to cherry-pick one term from its context. *State v. Beaulieu*, 2025 ME 4, ¶ 14, 331 A.3d 280 ("The first step in statutory interpretation requires an examination of the plain meaning of the statutory language in the context of the whole statutory scheme."), *Dickau v. Vermont Mut. Ins. Co.*, 2014 ME 158, ¶ 22, 107 A.3d 621 ("[W]e examine the entirety of the statute, giving due weight to design, structure, and purpose as well as to aggregate language."). A statute should provides notice of what conduct it prohibits and does not engender arbitrary enforcement. *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952) ("[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions."). AbbVie knows that is what Chapter 103 proscribes because Chapter 103, like similar laws in other states, "is targeted at precisely the conduct in which AbbVie and other drug manufacturers want to engage in order to limit the expansion of the 340B program," *Skrmetti*, 2025 WL 1805271, at *21.

AbbVie's Motion fails to support its contention that the conduct which Chapter 103 prohibits is unconstitutionally vague. This Court should, accordingly, deny AbbVie's request for a preliminary injunction.

### C. AbbVie has not demonstrated that it is likely to suffer irreparable harm in the absence of a preliminary injunction barring enforcement of Chapter 103.

AbbVie relies primarily on the merits of its claims to support a contention that it will be "irreparably harmed" by an obligation to comply with an allegedly unconstitutional law. AbbVie's Motion at 22-23. Since this is a pre-enforcement action, AbbVie does not, and cannot,

provide anything other than speculation regarding the administrative difficulty of not interfering in contracts between Maine healthcare entities and pharmacies.  *Id.* at 23.

"An 'irreparable injury' for the purposes of preliminary relief is 'an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.'" *California*, 769 F. Supp. 3d at 78 (quoting *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005)). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)). Therefore, in addition to clearly showing irreparability, a plaintiff, "must 'demonstrate that irreparable injury is *likely* in the absence of an injunction,' not merely that it is a possibility." *Denbow v. Maine Dep't of Corr.*, 2020 WL 3052220 at *22 (D. Me. June 8, 2020) (quoting *Winter*, 555 U.S. at 22); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("proof of a mere possibility of injury is insufficient to justify an injunction").

AbbVie has identified no injury beyond the cost of complying with federal law, which it voluntarily undertook in exchange for access to Medicare reimbursement, 42 U.S.C.A. § 256b(a)(1), and vague assertions of increased costs of compliance.  AbbVie's Motion at 23. With respect to its burden to establish the merits of its underlying claim to justify a preliminary injunction, AbbVie has failed to show that there is "no set of circumstances" under which Chapter 103 is constitutional.  *Salerno*, 481 U.S. at 745. Because Chapter 103 mandates compliance with federal law as it applies to covered entities in Maine, AbbVie has not established an irreparable injury.

> **D. AbbVie fails to establish that the balance of equities regarding the enforcement of Chapter 103 tips in its favor or that barring the enforcement of Chapter 103 is in the public interest.**

AbbVie's observation that there is no evidence of a public benefit from Chapter 103's support of Section 340B discounts is incorrect. Programs funded by the Section 340B discount increase patient access to healthcare services and reduce the cost of drugs. [8]  *See* Marden Decl. at ¶ 12; Rusby Decl. at ¶10 (identifying programs funded through 340B discounts, including medication assistance programs and free health care to uninsured and underinsured patients). AbbVie's contention that directly passing 340B discounts to patients is the only way to serve the "public interest" ignores the structure of Section 340B. *Sanofi*, 58 F 4th at 699 (Section 340B "giv[es] covered entities "extra revenue from serving insured patients.").

Section 340B effectuates a benefit to patients of covered entities *through* the covered entities' ability to use those discounts to fund a broad compliment of services to patients. Marden Decl. at ¶12; Rusby Decl. at ¶10. Discounts from covered entities' purchases of prescription drugs at Section 340B prices support healthcare entities which serve rural, poor, and other underserved populations in Maine. *Id.* The losses which the restrictive delivery policies

---

[8] AbbVie submitted supporting materials unsworn documents identified as "reports" of two (2) proffered experts retained for the purpose of litigation in support of AbbVie's Motion. Expert Report of Alice Chen, Ph.D. (Aug. 21, 2025) [ECF Doc. No. 17-3]; Expert Report of Amitabh Chandra, PhD. (Aug. 21, 2025) [ECF Doc. No. 17-4]. Proceedings on a request for preliminary injunction are governed by "procedures that are less formal and evidence that is less complete than a trial on the merits." *Univ. of Tex*, 451 U.S. at 395. While that standard promotes efficiency in consideration of motions seeking "an extraordinary and drastic remedy," *Peoples Fed. Sav. Bank*, 672 F.3d at 8-9, it is also affords a short time to review and evaluate the "reports" which AbbVie appears to contemplate exist in some liminal space between expert affidavits and reference material. *Cf.* Fed. R. Evid. 702 (addressing requirements for expert to "*testify* in the form of an opinion"). Defendants accordingly reserve their rights to object to the reliability and admissibility of the proffered opinions. *See Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 97 (1st Cir. 2020) ("*Daubert* [*v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993)] assigns the trial court the role of "gatekeeper," which requires courts to make an independent determination that "any and all scientific testimony or evidence admitted [at trial] is not only relevant, but reliable."); *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (Rule 702 "necessitates an inquiry into the methodology and the basis for an expert's opinion.").

barred by Chapter 103 have caused, reducing the ability of covered entities to serve their patients, are significant.  Marden Decl. at ¶14 ("[F]or fiscal year 2023/2024, MaineHealth experienced a nearly 50% reduction in 340B Savings due to these restrictions, representing tens of millions of dollars."); Rusby Decl. at ¶12 ("Several drug manufacturers have imposed restrictions on PCHC that prohibit PCHC from contracting with more than one contract pharmacy under the 340B Program.  This has had a profound impact on PCHC's 340B Program savings, with a loss of approximately $5 million in 340B Program savings in budget year 2024 compared to budget year 2023.").  Refraining from interfering with that benefit, at the very least pending the resolution of the merits of AbbVie's Complaint, is clearly in the public interest.

## CONCLUSION

AbbVie has failed to meet the "high threshold" to establish preemption and has failed to clearly show that it is entitled to a preliminary injunction.  In addition to failing on the merits, the balance of equities guiding this Court's discretion in evaluating whether a preliminary injunction is warranted clearly favors the public interest in preserving the benefit of congressionally mandated discounts and the public health programs funded by those discounts.  This Court should, accordingly, deny AbbVie's Motion.

Date:  September 11, 2025          Respectfully submitted,

                                      AARON M. FREY
                                      Attorney General

                                      /s/ Sean D. Magenis
                                      Sean D. Magenis
                                      Michael T. Devine
                                      Assistant Attorney General
                                      Office of the Attorney General
                                      6 State House Station
                                      Augusta, ME  04333-0006
                                      (207) 626-8830
                                      sean.d.magenis@maine.gov
                                      *Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th of September 2025, I electronically filed the above

document with the Clerk of Court using the CM/ECF system which caused a copy of said

document to be transmitted to all counsel of record.

                                      /s/ Sean D. Magenis
                                      SEAN D. MAGENIS
                                      Assistant Attorney General
                                      Office of the Attorney General
                                      6 State House Station
                                      Augusta, ME  04333-0006
                                      (207) 626-8830
                                      sean.d.magenis@maine.gov