# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ABBVIE INC.; ALLERGAN, INC.; DURATA THERAPEUTICS, INC.; ABBVIE PRODUCTS LLC; PHARMACYCLICS LLC; and ALLERGAN SALES, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>AARON FREY, in his official capacity as Attorney General of the State of Maine; BOB CAREY, in his official capacity as Maine Superintendent of the Bureau of Insurance<br><br>*Defendants*. | Case No. 1:25-cv-00416-JCN<br><br>**ORAL ARGUMENT**<br>**SEPTEMBER 17, 2025** |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

Chapter 103 is unconstitutional three times over. It rewrites the federal 340B Program, adding new requirements and enforcement provisions Congress chose not to include. It forces AbbVie to transfer its property to private, for-profit companies—without any compensation or state-provided benefit to AbbVie and without serving any public use. And it subjects AbbVie to steep financial penalties for failure to comply with impossibly vague statutory prohibitions. A preliminary injunction is not only appropriate but necessary.

## ARGUMENT

**I.      ABBVIE HAS ARTICLE III STANDING.**

AbbVie has established Article III standing because "[w]ithout Chapter 103, AbbVie would make fewer 340B-priced sales," many of which take place at "pennies on the dollar of the prevailing market price." Ex. 26 (Second Scheidler Decl.) ¶¶ 13–14. "[M]onetary harms" are among "[t]he most obvious" of "traditional" and "tangible harms." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Moreover, the money that AbbVie loses because of Chapter 103 is money that AbbVie cannot use to develop new life-saving medications. Doc. 15-1 ¶ 25.

AbbVie has already detailed how Chapter 103 will compel it to make additional sales. Under AbbVie's current policy, it will accept orders for 340B-priced drugs from hospital covered entities (without an in-house pharmacy) for a single contract pharmacy "***provided that***, (i) the covered entity submits limited claims data on 340B utilization … and (ii) the one contract pharmacy is located within 40 miles of the [covered entity]." *Id.* at 65 (emphasis added). In other words, if covered entities do not accept those conditions, they do not accept AbbVie's offer of 340B pricing, and no sale is completed. Chapter 103 prohibits AbbVie from adhering to that policy by barring AbbVie from "deny[ing]" "the acquisition of a 340B drug by" "a 340B contract pharmacy." 24-A M.R.S.A. § 7753(1). That prohibition will have obvious financial

consequences for AbbVie in the form of "millions of dollars in forced unnecessary discounts each year." Doc. 15-1 ¶ 27. AbbVie's cost of complying with similar state laws is around $33.1 million (Mississippi) and $35 million (Missouri) annually. *Id*. And AbbVie estimates that complying with Chapter 103 will cost "approximately $90 million in the next year." *Id.*

There is no doubt that these injuries flow from Chapter 103 rather than the federal 340B statute. Under that statute, manufacturers are obligated only to "offer" their drugs at the 340B price to covered entities—and manufacturers retain the freedom to include contract-pharmacy limitations in those offers. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463–64 (D.C. Cir. 2024). In other words, federal law does not require anything more than what AbbVie offers in its current contract-pharmacy policy. But Chapter 103 requires AbbVie to transfer 340B drugs to ***unlimited*** contract pharmacies (rather than just one). *See* 24-A M.R.S.A. § 7753(1). And cooperating with unlimited contract pharmacies (rather than one) will lead to a significant increase in the ***volume*** of drugs it sells at the 340B price. Doc. 15-1 ¶ 26.

Defendants' rejoinder to the contrary reflects a basic misunderstanding of the 340B Program and the issues in this litigation. AbbVie's monetary injuries do not depend on contract pharmacy's violating the 340B statute. *Contra* Doc. 27 at 13–14. Chapter 103 compels AbbVie to complete additional sales, and AbbVie suffers monetary harms, irrespective of any 340B Program violations that occur as a result. The rampant unlawful diversion in contract pharmacies lays bare that Chapter 103 is particularly wrongheaded.

II.     **ABBVIE IS LIKELY TO SUCCEED ON THE MERITS.**

    A.     **Maine's Law Is Preempted.**

By regulating the federal 340B Program—and only the federal program—Maine's law intrudes on a purely federal field. And Maine's methods—creating new obligations and enforcement mechanisms while at the same time blocking AbbVie from the federal dispute

resolution process—conflict with Congress's own purposes and methods. Chapter 103 is thus preempted under both the field and conflict preemption doctrines. *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012). In arguing to the contrary, Defendants commit a threshold error that substantially undermines their position: Defendants define the relevant field at an impossibly broad level of generality like "[h]ealth and safety" or "public health." Doc. 27 at 16–18. But nearly every law bears upon those subjects in one way or another. These definitions, if adopted, would amount to a get-out-of-preemption-free card. Courts deciding preemption questions therefore define the field narrowly. *See, e.g.*, *Arizona*, 567 U.S. at 400 (defining the field as "alien registration" based upon the text of the state law in issue). That is precisely what AbbVie has done: Chapter 103 by its own terms regulates nothing but transactions under the 340B Program. That is the proper definition of the field.

As such, this Court should not presume Chapter 103 is constitutional. *Contra* Doc. 27 at 15–18, 21. That is because Chapter 103 regulates "inherently federal" subject matter that "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001). Maine's law exclusively regulates ***only*** manufacturers' 340B offers to covered entities. If Congress terminated the federal 340B Program tomorrow, Chapter 103 would regulate nothing. The Maine law's sole purpose is to dictate the terms of a drug manufacturer's offer to a 340B covered entity.

***Field Preemption***. Against this backdrop, Chapter 103 clearly intrudes upon the field of the 340B Program—in particular, by regulating the terms of a 340B offer. *See* Doc. 14 at 10. A manufacturer's agreement with the federal government under the 340B Program to ***offer*** drugs at discount prices is the key criterion for eligibility to participate in that program. *See* 42 U.S.C. § 256b(a)(1). Congress created that 340B offer and necessarily defined its scope. In doing so,

3

Congress preserved manufacturers' ability to attach reasonable conditions to those offers. *See Novartis*, 102 F.4th at 463–64; *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health and Hum. Servs.*, 58 F.4th 696, 703–06 (3d Cir. 2023).

By eliminating manufacturers' ability to attach those conditions, Maine changes the rules that apply to participants in the federal 340B Program. Ironically, the State's own articulation of the field preemption analysis echoes AbbVie's logic. The State says the right way to view the field preemption analysis is to "fram[e] the 'field' based on the transaction" at issue. Doc. 27 at 16. That is precisely AbbVie's point: The "transaction" that Chapter 103 acts upon is a manufacturer's offer to a 340B covered entity. And that offer occurs only in the context of the purely federal 340B Program. It thus goes without saying that Chapter 103 extends well beyond an "area[] that ha[s] been traditionally occupied by the states." Doc. 27 at 16. Maine offers not one example of its previous attempts to regulate the terms of the 340B Program—because it never has before now.

**Conflict Preemption**. The First Circuit has established a clear conflict-preemption rule: If federal law grants a right that state law takes away, then the state law is preempted. *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022). Two federal circuit courts have held that the federal 340B statute gives manufacturers like AbbVie the right to impose the conditions on 340B offers at issue in this case. *See Novartis*, 102 F.4th at 463–64; *Sanofi*, 58 F.4th at 703–04. Defendants gratuitously chant "silence" as if the word itself were talismanic, but *Novartis* and *Sanofi* reasoned that the statute's use of the term ***offer*** (as opposed to "sell"), plus the absence of any delivery-related requirements, "***preserves*** … the ability of sellers to impose at least some delivery conditions." *Novartis*, 102 F.4th at 460; *see also Sanofi*, 58 F.4th at 703–06. Defendants read those decisions creatively to argue that congressional "silence" left a

4

gap that states could fill any way they see fit. *See* Doc. 27 at 19. That is simply wrong: The federal statute retains a "right" for AbbVie "that conflicts with [Chapter 103's] restrictions," so Chapter 103 is conflict preempted. *Me. Forest Prods. Council*, 51 F.4th at 8.

Chapter 103's conflict with the 340B Program is underscored by the parallel enforcement scheme that it creates. Maine claims adjudicatory authority over disputes where a manufacturer has "den[ied], restrict[ed], [or] prohibit[ed]" a "340B contract pharmacy['s]" "acquisition of a 340B drug." 24-A M.R.S.A. § 7753(1). But HRSA's federal enforcement scheme specifically contemplates "[c]laims by a covered entity … that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a). The likely conflicting adjudications that will result are precisely the outcome Congress sought to avoid when it created the 340B Program—and that is to say nothing of the risk of conflicting adjudications between Maine and other States. *See PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 458 (S.D. W. Va. 2024); *see also Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 119–20 (2011) (explaining Congress's plan for "centralized enforcement" that would ensure "harmonious[]" administration "on a uniform, nationwide basis"). Congress's exclusive enforcement scheme preempts Maine's. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379–81 (2000); *City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988).

Defendants have no answer for any of this. They offer only the *ipse dixit* that "[c]laims subject to enforcement under Chapter 103 are distinct from those reserved to HRSA." Doc. 27 at 23. But the plain text of Maine's law and the ADR regulations belie that assertion. And examples abound. A state court or agency handling a dispute under Chapter 103 may have to determine whether the party alleging injury was eligible to participate in the 340B Program. *See* 24-A M.R.S.A. § 7752(7). Or a manufacturer may raise as a defense that yielding to Chapter

5

103 would have led to unlawful diversion, such that a covered entity's or contract pharmacy's "receipt of [the] 340B drug[s] [was] prohibited by [HHS]" or federal law generally. *Id.* § 7753(1). Or more fundamentally, a Maine tribunal could conclude that a manufacturer has ***unlawfully*** "den[ied]" 340B pricing to a contract pharmacy while a federal tribunal concludes that the manufacturer ***lawfully*** limited its 340B pricing. *Astra* does not tolerate such results.

The State likewise has no way to justify its claims data prohibition. Defendants imagine a world in which covered entities willingly deliver claims data to manufacturers. *See* Doc. 27 at 24. But covered entities do no such thing, even during the good faith-inquiry process that must precede an ADR claim. *See* 42 C.F.R. § 10.21(b)(4); Doc. 15-1 ¶ 24 ("Covered entities do not generally provide claims data voluntarily or upon request, which is why AbbVie attaches the claims data provision as a condition of its offer."). Neither of Defendants' declarants suggest they would voluntarily provide claims data to AbbVie.

Finally, Defendants do not even respond to AbbVie's argument that Chapter 103 is preempted by HRSA's rebate pilot program. The closest they come is stating in a parenthetical that the "restriction on demanding [claims] data" is "inapplicable where 'data sharing is required by [HHS].'" Doc. 27 at 25. It is unclear if Defendants think the pilot program requires covered entities to provide claims data. If yes, then Defendants should clarify on the record that they will not base a Chapter 103 prosecution on a claims data requirement related to the pilot program. If no, then the Court should preliminarily enjoin any such prosecutions.

**B.     Maine's Law Effects an Unconstitutional Taking.**

Maine's law effects a physical taking without just compensation and for no public use. AbbVie only sells its drugs at the 340B price to covered entities ***provided that*** the entity submits claims data, and its single, designated contract pharmacy is within 40 miles of the covered entity. Doc. 15-1 at 65. "AbbVie would deny 340B pricing to the covered entity—***before the order is***

6

*completed*—if the at-issue medication was or will be transferred anywhere other than the covered entity's in-house pharmacy or its single, designated contract pharmacy." Ex. 26 ¶ 8. Chapter 103 nevertheless coerces a sale by requiring AbbVie to transfer its property to unlimited contract pharmacies whenever a covered entity demands it, and without any of the conditions contained in AbbVie's contract-pharmacy policy. *See* 24-A M.R.S.A. § 7753(1). Because Chapter 103 requires AbbVie to transfer possession of its drugs to covered entities and contract pharmacies, it works a physical taking. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015); *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021) (acknowledging that a physical taking occurs when the government appropriates property "for itself *or a third party*" (emphasis added)).

The State responds that "Chapter 103 does not compel AbbVie to transfer its property through sales" because the state law merely "prohibits AbbVie from interfering with sales compelled by Section 340B." Doc. 27 at 26. That argument misstates both state and federal law. Section 340B requires only an *offer*, which covered entities are free to take or leave—it does not require an outright sale. *Novartis*, 102 F.4th at 460; *see also Sanofi*, 58 F.4th at 703–06. Maine, through Chapter 103, creates its own obligation to *sell*—over and above what the 340B statute requires. It does so by eliminating the conditions AbbVie would otherwise place on its offer.[1]

Further, Chapter 103 serves no public use. AbbVie's property does not go to the government, nor is it held for a public benefit. It goes to private, for-profit entities who keep the

---

[1] In a footnote, the State suggests that Chapter 103 is somehow voluntary. Doc. 27 at 27 n.6. That is incorrect for reasons AbbVie has already explained. *See* Doc. 14 at 19–20. Manufacturers that seek coverage for their life-saving medications under Medicaid and Medicare Part B are *required* to join the federal 340B Program. 42 U.S.C. § 256b(a)(1); *id.* § 1396r-8(a)(5)(A). If they do not agree to the demands of the 340B Program, their participation in Medicaid and Medicare Part B is revoked. Years after AbbVie made that choice, Maine adopted its own forced-sale regime that is enforced through civil monetary and other penalties. 24-A M.R.S.A. § 12-A. Maine appears to think that because AbbVie could conceivably evade those penalties by withdrawing from the 340B Program, Medicaid, and Medicare Part B on a *nationwide basis*, Maine's new law is "voluntary." That is without support in law or logic.

7

benefits for themselves. The arbitrage that Chapter 103 protects does not improve outcomes or increase charity care for needy patients. Quite the opposite: as the number of contract pharmacy arrangements increase, the rate of charity care *decreases*. *See* Doc. 17-4 ¶¶ 58–60.[2]

    **C.**     **Maine's Law Is Void For Vagueness.**

Chapter 103 is unconstitutionally vague. In two separate, expansive provisions, Maine's law purports to outlaw any act that "interfere[s]" with contract pharmacies. 24-A M.R.S.A. § 7753(1), (3). It is impossible for AbbVie to know what those provisions prohibit.

Defendants' attempts to provide clarity to Chapter 103 only reinforce the law's vagueness. Defendants first try to say that "interfere" is given meaning by the preceding terms, "deny, restrict, [and] prohibit." Doc. 27 at 28. That does not answer the question of what "interfere" means. Rather, it raises the question of what conduct by AbbVie would constitute interference that would not constitute a denial, restriction, or prohibition on a contract pharmacy's acquisition of AbbVie's drugs. Defendants next try to read Section 7753(1)'s interference provision against a common law backdrop, noting that "the concept of interference with contracts has been part of Maine common law for over a century." *Id.* But there is no textual basis to support Defendants' assumption that Chapter 103 is codifying a form of tortious interference with a contract. *See United States v. Stevens*, 559 U.S. 460, 481 (2010) ("This Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction."). In fact, Section 7753(1) looks nothing like a tortious interference claim. Tortious interference claims require proof of bad intent. *See Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d 1104, 1110. Section 7753(1) has no such scienter requirement. Tortious

---

[2] Although Chapter 103's private wealth transfer serves no public use, even if this Court disagrees, an injunction is still warranted. *Contra* Doc. 34 at 12. There is no dispute that Maine has provided no compensation for Chapter 103's taking. Where, as here, the State takes property without paying for it and provides no mechanism for compensation, a property owner may obtain injunctive relief. *See Knick v. Township of Scott*, 588 U.S. 180 (2019).

8

interference claims require the defendant to have caused the termination of a contractual relationship. *See June Roberts Agency, Inc. v. Venture Props., Inc.*, 676 A.2d 46, 50 (Me. 1996). Section 7753(1) purports to impose liability for doing anything that affects a contract pharmacy's ability to acquire AbbVie's drugs.

Notably, the State does not even try to argue that Chapter 103's second, broader interference prohibition is constitutional. *See* 24-A M.R.S.A. § 7753(3). So even if the Court agreed with the State that Section 7753(1)'s use of "interfere" is not vague, there is no avoiding the unconstitutionality of Section 7753(3).

### D. AbbVie Does Not Bring Facial Challenges

Defendants incorrectly assert that AbbVie is bringing a facial challenge of Chapter 103. *See* Doc. 27 at 14–15. AbbVie's claims in this litigation are as-applied, not facial. AbbVie wants to engage in specific conduct: implementing its contract-pharmacy policy. Enforcement of Chapter 103 against AbbVie will prevent AbbVie from doing so. All that AbbVie seeks in this action is a declaration that Chapter 103 cannot constitutionally be enforced against AbbVie based on AbbVie's implementation of its contract pharmacy policy, and injunctive relief tailored to fit that declaration. *See* Doc. 1 ¶ 19 ("AbbVie further seeks injunctive relief barring the Maine Attorney General and the Maine Superintendent of the Bureau of Insurance from enforcing Chapter 103 ***against AbbVie***." (emphasis added)). AbbVie is not asking this Court to hold that Chapter 103 cannot be enforced against other manufacturers or their policies.

### III. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR ABBVIE.

The remaining preliminary-injunction factors likewise favor AbbVie. *See* Doc. 14 at 22–24. Contrary to the State's confused argument, AbbVie has established that it will ***certainly*** suffer irreparable harm absent a preliminary injunction. The State contends, wrongly, that federal law forces AbbVie to sell its drugs at steep discounts and that Chapter 103 simply

9

"mandates compliance with federal law as it applies to covered entities in Maine[.]" Doc. 27 at 30. As explained, Chapter 103 forces heavily discounted sales that, absent Chapter 103, would not occur. *See supra* pp. 1–2, 6–7. Every forced sale injures AbbVie, and AbbVie has no recourse after the fact. Moreover, Chapter 103 puts AbbVie to an unconstitutional choice: AbbVie must either risk liability under state law for exercising its right to attach reasonable conditions to its 340B offers, or give up its federal rights to avoid state law liability. As Judge Woodcock rightly held, being put to that choice would irreparably harm AbbVie. *See Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 62–63 (D. Me. 2022).

If AbbVie ultimately succeeds on the merits of its claims, which it has demonstrated is likely, the absence of preliminary injunctive relief would mean Maine enforced an unconstitutional law during this litigation—something the State wisely does not claim an interest in doing. The public certainly has no interest in enforcement of an unconstitutional law. *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997). Moreover, Maine's law **harms** the public interest by making it more difficult to identify diversion and duplicate discounting, *see* Doc. 15–1 ¶¶ 21–24, which is so against the public interest that there is a comprehensive federal enforcement system specifically intended to root out and discipline those who commit such offenses, *see* 42 U.S.C. § 256b(a)(5)(A)–(B); *id.* § 256b(d); *cf. PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 452 (S.D. W. Va. 2024) (noting the "twin federal purposes" of "providing discounts to covered entities only and prohibiting fraud through duplicate discounts" (emphasis omitted)). And, practically speaking, it is not the public that benefits from enforcement of Chapter 103: Maine's law simply takes money from patients (or their insurers) and gives it to contract pharmacies and hospitals.

## CONCLUSION

The Court should grant AbbVie's motion for a preliminary injunction.

Dated: September 16, 2025

Respectfully submitted,

<u>/s/ Paul McDonald</u>
Paul McDonald
John A. Woodcock III
Bernstein Shur
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
Telephone: (207) 774-1200
Email: pmcdonald@bersteinshur.com
      jwoodcock@bernsteinshur.com


Matthew S. Owen, P.C. (admitted *pro hac vice*)
Meredith M. Pohl (admitted *pro hac vice*)
Nick Bell (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Email: matt.owen@kirkland.com
      meredith.pohl@kirkland.com
      nick.bell@kirkland.com

*Counsel for Plaintiffs*